## QUINCY *vs.* QUINCY.

Upon a libel, by the husband, for a divorce, if there is evidence tending to show that the wife has a good defence, and that she has no property, the court will order the husband to furnish her a reasonable sum, to enable her to make her defence. The affidavit of the wife is usually received as sufficient evidence.

If either husband or wife forgives the infidelity of the other, it cannot afterwards be set up as a ground of divorce, without evidence of a farther injury.

Forgiveness, or condonation, may be express or implied.

If, having reasonable knowledge of the infidelity of his wife, and of his power to make proof of the fact—the husband, notwithstanding, cohabits with her as a wife, this is an implied condonation, and bars him of any right to avail himself of the previous adultery alone, as a cause of divorce.

But cohabitation, under circumstances which might excite suspicion merely, does not amount to condonation.

LIBEL for a divorce, setting forth that the libellee had committed adultery with one Lewis C. Blaisdell.

The libellee offered an affidavit tending to show condonation; and, upon the motion of her counsel, an order was made that the libellant furnish her with the sum of twenty dollars, to enable her to make her defence.

Evidence having been submitted upon both sides, a divorce was decreed, according to the prayer of the petition.

The facts of the case sufficiently appear, from the opinion of the court.

*Hackett*, for the libellant.

*Hayes*, for the libellee.

PARKER, C. J. The libellee, upon her affidavit, tending to show that she has a good defence to the prayer of this libel, and upon the motion of counsel, showing her want of means, has had the benefit of an order that the libellant should provide her with money, to enable her to lay her evidence before us. We consider this as a matter of right, and but simple justice to a wife who is without property, and

against whom her husband is proceeding for a dissolution of the marriage. 1 *Haggard's Eccl. Rep.* 773, *D'Aguilar* vs. *D'Aguilar ;* 2 *Paige's Ch. Rep.* 621, *Osgood* vs. *Osgood.* We do not make an order of this kind, except upon some evidence tending to show that she has a good defence ; but her own affidavit is deemed, under ordinary circumstances, sufficient for the purpose.

The allegations in this libel are supported by evidence tending, very strongly, to show several acts of adultery by the libellee, at Portsmouth, in August and September last, during the absence of the libellant, who is a master mariner ; and by further evidence, that in September she left her home in Portsmouth, and was followed by Blaisdell to Boston, from which place they travelled to New-York, and farther south, representing themselves as husband and wife, upon the journey. She returned to her mother's, in Portsmouth, before the libellant returned from the voyage on which he was then absent in a coasting vessel.

The libellee offers no evidence to contradict this, and makes no denial of the allegations of the libel. Her defence is rested solely upon the ground, that after the return of her husband, and after he had knowledge of her elopement with Blaisdell, he forgave the offence.

It is well settled that a husband may, in this mode, bar himself of a divorce for this cause. If either party to a marriage thinks proper to forgive the infidelity of the other, it cannot afterwards be set up as a ground of divorce, without evidence of a farther injury. Forgiveness, or condonation as it is usually termed, may be express or implied. 1 *Haggard's Eccl. Rep.* 789, *Beeby* vs. *Beeby ;* 4 *Paige's Ch. R.* 432, *Smith* vs. *Smith.* It is said to be accompanied with the implied condition that the party shall be treated afterwards with conjugal kindness. 1 *Haggard* 733, *Durant* vs. *Durant ; Ditto* 773. But it has been held, in New-York, that in order to revive condoned adultery, so as to entitle the injured party to a divorce, the subsequent misconduct of the

defendant must have been of the same character. 4 *Paige* 460, *Johnson* vs. *Johnson.*

If, having reasonable knowledge of the infidelity of his wife, and of his power to make proof of it, the husband, notwithstanding, cohabits with her as a wife, this is an implied condonation, and bars him of any right to avail himself of the mere fact of the previous adultery, as a cause of divorce. 2 *Phillimore's Eccl. Rep.* 403, *Dunn* vs. *Dunn;* 3 *Haggard* 76, *Timmings* vs. *Timmings;* 2 *Paige* 109, *Wood* vs. *Wood;* and authorities before cited.

The penitence and contrition of the wife may, in some instances, induce the husband to overlook the infidelity—he may be actuated by strong affection, or a regard for his children—other circumstances may operate upon his mind, in connection with these, to induce him to extend his forgiveness—he may be conscious that very strong reasons exist why he should not complain of an offence for which he has set the example, or to which he has given occasion by his indifference—he may be insensible to the injury, while he is not so to the solace to be derived to himself from a continuance of the marriage—and if from all or any of these causes he overlooks the guilt, and continues to cohabit with his wife, after knowledge of the guilt and of the sources of proof, he is not at liberty, upon whim, or caprice, or for any other reason except some new cause of complaint against her, to revoke the pardon he has once granted. He cannot hold her to his bosom as a wife whom he is at liberty to cast off whenever his pleasure may dictate an application for a dissolution of the marriage.

But cohabitation under circumstances which excite suspicion merely, does not amount to condonation. 3 *Haggard* 338, *Turton* vs. *Turton;* Ditto 618, *Bramwell* vs. *Bramwell;* 1 *Haggard's Cons't R.* 269, *Elwes* vs. *Elwes.*

The libellee has introduced her affidavit, setting forth that after the return of the libellant he accused her of an improper connection with Blaisdell, and that she acknowledged

Quincy v. Quincy.

she had gone to New-York and Washington with him, and that Blaisdell had offered to marry her—that she said she had done wrong, and was sorry for it—that the libellant was at home four or five days, and lived with her as he always had done—that after he had been at home a day or two, he requested her to go to Mr. Hackett's office, saying he wished ed to get some of Blaisdell's property, where she stated she had gone south with him—that his counsel advised him that he could do nothing with Blaisdell until he got a divorce, and that on the way home he said he did not want to get divorced, and would not—that he left for Haverhill, Massachusetts, saying to her not to think any more about the matter, as he should not trouble himself any more about it, and she supposed that every thing was forgotten and forgiven—and that when he returned from Haverhill she left her mother's house, where she had gone, and lived with him two days, until the copy of the libel was served upon her. She is explicit to the cohabitation during that time. She further states that she then left the house, but that he has since frequently asked her to come there ; and until the testimony was taken, about a week previous to the sitting of the court, frequently assured her that he was going to do nothing about the business, and had given it up.

This evidence, if credited, would show condonation, both express and implied. It could not be contended that such a confession did not furnish reasonable knowledge of her guilt ; and, under circumstances of such publicity, he could not delay from a doubt whether he could make sufficient proof.

Her affidavit is accompanied by evidence, tending to show that he was informed of improper familiarities of Blaisdell with his wife, and that she had gone off with him, while he was at Gardiner, in Maine, before his return from his voyage ; and that after his return he treated her as he had been accustomed to do, and cohabited with her. One witness speaks of his admission that he had slept with his wife, after his return.

The libel bears date the 28th of October, and the order of notice was served on the 2d of November. The mother of the libellee states that she herself returned from Boston the day after the date of the libel, and for two or three days after she returned the libellant was in her house, where her daughter then resided, two or three times a day, after her, and wished she would go back and live with him; and that she heard him say to his wife, if she would go back and live with him, and behave as well as she had done, he would live with her. She speaks further of his attentions to his wife, at her house, on the evening of the 23d of November, when she was brought home sick, had fits, and either was, or was represented to be, dangerously ill. The mother states that he, at this time, appeared to be very much alarmed about her, was very attentive, and towards morning took off his coat, if no more of his clothes, and lay down in the bed with her. And she states that almost the first thing Mrs. Quincy said that evening was something about the child, and that he said, " don't worry, you shall have me and the child too, before a year."

The libellant in his affidavit admits that he heard, at Gardiner, that his wife had gone off with Blaisdell; and states that he returned to Portsmouth as soon as he could, being the 17th of October—that his wife and her mother both told him that she had only been to Boston, to see a sick sister—but his wife stated the next day that she had been as far south as New-York, to see her relations there—that people in town were talking about her going away with Blaisdell, but that she and her mother adhered to the story which they had told—that on the 19th he told her the stories in town and her's did not agree, whereupon she became excited, and went to her mother's—that she afterwards agreed to tell him the whole truth connected with her going away with Blaisdell, and that Mr. Hackett should be present—that she then admitted she had agreed to go away with Blaisdell, who promised to marry her, and that

they met in Boston by agreement, and travelled in company together as far as Washington, but she thought much of her child, and concluded to return—and that she would not admit that there was any improper connection, during her absence.    He states that the day after he ascertained she had been to Washington, he went with his vessel to Haverhill ; and while the vessel was there he went south, in order to ascertain the facts, and became satisfied that she had travelled with Blaisdell as his wife—and that the next day after his return he engaged a place for his child, and told her the investigations he had made, and his intention to procure a divorce ; the petition for which was drawn the same day. He says, that up to the time when he went to Haverhill he was obtaining information respecting the facts, and having determined to place his child in some reputable family, thought it proper to conceal his purpose of a divorce from her until he had secured that object.

If her statement, that he had cohabited with her up to the time when the copy of the libel was served upon her, was fully substantiated, it would be clear that he had barred himself from all right to sustain this libel ; for he admits that he had full conviction of her guilt, and the sources of proof, when he returned from Haverhill, which was the day before the libel was filed, and several days before the service.

Had the evidence shown that he cohabited with her after the time when she admitted that she agreed to go away with Blaisdell, he having promised to marry her, and that they met in Boston, and travelled in company to Washington, the implied condonation would be sufficiently clear ; for, after such a confession, a husband of ordinary sagacity could hardly doubt the adultery, if she did not admit it ; nor would there seem to be any reason why he should doubt his ability to make the necessary proof.

Had the evidence satisfied the court that there was cohabitation before this time, after his return, but none after he ascertained that she had been to Washington, the question

would have been of a character somewhat more nice. He undoubtedly had information sufficient to have satisfied many husbands, soon after his return. When his wife admitted, contrary to the first statement of herself and her mother, that she had been as far as New-York, the admission, connected with what he had heard from others, would have furnished to most men matter for grave belief. It is hardly possible that her statement, that she went to visit her relations, should have been satisfactory ; and the affection which could have prevented weighty suspicion, not to say reasonable conviction, must have been strong indeed. He could hardly be said to stand in circumstances to excite suspicion merely, nor could he excuse cohabitation, upon the ground that a refusal would probably deprive him of the means of discovery and proof.

But he denies, quite as explicitly as she alleges it, that he had any matrimonial intercourse with her after his return from Gardiner. He details, at some length, her attempts, and those of her mother, at several times up to the 21st of November, to induce him to receive her as a wife—her declaring, with an oath, one evening, that she would sleep in his bed, and her enquiry, after she had taken possession of it, if he was not coming to bed, which he refused to do, and staid in the shop—the declaration of her mother to her, another evening, "there is your bed, go and sleep in it ;" to which he replied by a denial that it was her bed, as he had let her take one when she left, and by a declaration that they knew his determination, and he wished she would keep away. According to his statement, there was alternate coaxing and threatening, on the part of both.

He is corroborated, to a very considerable extent, by other witnesses, and particularly by Mrs. Berry and Mrs. Spinney, who live in the same house ; the former of whom says she has never known him to sleep with his wife since he returned from Gardiner, and thinks she should have known it if he had done so. He is supported by Stephen Seavey in a

statement, that when he, the next day after he returned from Haverhill, told her that he never would live with her again, and assigned as one of the reasons, that she had lied to him about going south with Blaisdell, she said she would as soon lie as tell the truth, and if she had lied it was none of his business.

Upon this state of the evidence, we are of opinion that cohabitation, after knowledge, is not proved, notwithstanding her statement.

Nor is there any thing, in the residue of the evidence, to establish the defence. She alleges that he said, on coming from Mr. Hackett's office, that he did not want a divorce—that he frequently asked her to come to the house; and until his testimony was taken, about a week previous to the sitting of the court, repeatedly assured her that he was going to do nothing about the business. But he denies making the declaration that he did not want a divorce, and the allegation that he gave any assurances that he had or intended to abandon the proceedings. He admits that he sought several interviews with her, for the purpose of getting some explanations of her proceedings, and to make some arrangements about their child; and that he has, on several occasions, said to her, that if she had exhibited such symptoms of regret for her offence as to render it likely that there would be no repetition of it, he should have tried to forgive and forget it. If the answers which he recites are correct, he is well warranted in the statement that he saw no symptoms of regret, or even the show of decent shame for her conduct.

It furnishes no bar to this proceeding, if he believed in the possibility of explanations which would prove her innocence, under circumstances which would have precluded all hope of that kind in the minds of others. And if the case shows the affection of the husband to have been so strong that, when conviction became a certainty, he would, notwithstanding, have extended his forgiveness to penitence and regret; the wife who had in the first instance repaid that affection

by an elopement, and who receives its subsequent manifestations with profanity and rudeness, is not entitled to transmute such ill requited, lingering attachment, into legal forgiveness. The evidence of her conduct, and that of her mother, already referred to, tends strongly to support his statements, and to show that he neither did or said any thing which should have led her to suppose he had an intention of abandoning the proceedings, without, at least, receiving assurances of contrition for the past, and of correct deportment for the future.

These remarks serve to dispose of the evidence respecting the conduct of the libellant towards his wife, on the night of the 23d of November. He states that he was repeatedly sent for, and at last went to her mother's to see her—that he did what he could to calm what he and others regarded as her last hours—that the family left him to watch alone with her, which he did until towards morning, when, having had no rest for two nights previous, he threw off his coat, and laid down upon the side of the bed—that the mother came and threw the quilt over him, and that he finally slept.

One witness testifies, that at the request of the mother he went for the libellant, and told him his wife was dying, and that he had to urge him a good while before he would go. A witness on the part of the libellee corroborates his statement that he divested himself of no other clothing than his coat, upon that occasion. Conjugal intercourse at this time, too improbable to be presumed, is not pretended by any one.

The evidence taken together proves him to be a man of kind feelings, who retained considerable affection for an erring wife, but fails to make out a case of condonation.

*Divorce decreed.*